**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

DEBORAH S. SULLIVAN and
GARY F. SULLIVAN,

Plaintiffs,

-v-

Case No.
Hon.

CAPE COD ACADEMY, PHILLIP PETRU, KELLY PETRU, DAVID McGRAW, CHRISTOPHER WADSWORTH, JAMES HOECK, WILLIAM TYLER, MICHAEL BENOIT, ROGER BOOCOCK, HOLLY CRISSAN, PATRICK FORAN ELLEN KINLIN, SONYA MITCHELL, KAREN RAUSS and DAVID SOUZA,

Defendants.
_______________________________________________/

Donald L. Bramlage, Jr. (P11123)
DONALD L. BRAMLAGE, JR., P.C.
Attorney for Plaintiffs
203 Lakeview Ave.
Grosse Pointe Farms, MI 48236
(313) 882-1776

Jenny L. Margeson
LAW OFFICE OF JENNY L. MARGESON
Attorney for Plaintiffs
800 Main St.
Dennis, MA 02638
(508) 385-6500
_______________________________________________/

**COMPLAINT AND JURY DEMAND**

NOW COME the above-entitled Plaintiffs, by and through their attorney, DONALD L. BRAMLAGE, JR., and say as follows for their Complaint:

**THE PARTIES**

1. Plaintiffs DEBORAH S. SULLIVAN and GARY F. SULLIVAN, husband and wife, are currently, and at all times pertinent hereto were, residents of the Commonwealth of Massachusetts. The Plaintiff DEBORAH S. SULLIVAN (herein after referred to as the "Plaintiff"), had been employed as a kindergarten teacher by the Defendant CAPE COD ACADEMY (hereinafter referred to as the "the Defendant CCA") since 2006, until the date of her termination at the end of the 2013-2014 school year.

2. Defendant CCA is an independent educational institution established under the laws of the Commonwealth of Massachusetts with its school campus located in Osterville, Massachusetts.

3. The Defendant PHILLIP PETRU, (hereinafter referred to as the Defendant Petru), upon information and belief, is a resident of the Commonwealth of Massachusetts and, at all times pertinent hereto was Head of School for the Defendant CCA, in which position, he had responsibility for the day-to-day operations of the Defendant CCA, including the implementation of all personnel matters and was a member of the Board of Trustees of the Defendant CCA. Further, the Defendant PHILLIP PETRU was involuntarily terminated by the Defendant CCA approximately 5 months ago for reasons related to the allegations below.

4. The Defendant KELLY PETRU is the wife of the Defendant PETRU, and is, upon information and belief, a resident of the Commonwealth of Massachusetts and, at all times pertinent hereto was Curriculum Director for the Defendant CCA, in which position, she had supervisory responsibilities relating to the Plaintiff.

5. The Defendants DAVID McGRAW, CHRISTOPHER WADSWORTH, JAMES HOECK, WILLIAM TYLER, MICHAEL BENOIT, ROGER BOOCOCK, HOLLY CRISSAN,

PATRICK FORAN, ELLEN KINLIN, SONYA MITCHELL, KAREN RAUSS and DAVID SOUZA, are residents of the Commonwealth of Massachusetts, and at all times pertinent hereto were members of the Defendant CCA's Board of Trustees who had the ultimate authority over personnel and other matters concerning the Defendant CCA's day-to-day operations and were in agreement with and fully complicit in the occurrences described below.

**JURISDICTIONAL AND VENUE ALLEGATIONS**

6. Venue is proper in this Court as the incidents alleged in this Complaint occurred in the Commonwealth of Massachusetts.

7. This suit is brought and jurisdiction lies pursuant to the Federal Age Discrimination In Employment Act (ADEA), as amended, 29 USC 621, et seq., and the Equal Pay Act (EPA), as amended, 29 USC 206(d), et seq.

8. The Plaintiff filed a charge of employment discrimination with the Equal Employment Opportunity Commission alleging a violation of the ADEA and the EPA within the statutory time period and has received a Notice of Right To Sue dated April 14, 2015. Further, Plaintiff has filed this action within 90 days of receiving said Notice.

9. The state court claims set forth in this Complaint are brought and pendent/supplemental jurisdiction lies pursuant to 28 U.S.C. S 1367(a).

**COMMON ALLEGATIONS**

**THE PLAINTIFF'S QUALIFICATIONS AND WORK PERFORMANCE**

10. The Plaintiff was 65 years of age at the time of the events that form the basis of the allegations contained in this Complaint.

11. By letter of July 6, 2006, the Plaintiff was hired as a full-time kindergarten teacher in the Defendant CCA's Lower School, at a salary of $41,000.00. Plaintiff's

employment arrangements were routinely renewed for each school year that followed, through the school year 2013 through 2014. Plaintiff's salary was increased each year to $47,057.00 per annum for the school year 2013 – 2014.

12. The Plaintiff's work performance was formally reviewed on only two occasions: for the 2006-2007 and 2007-2008 school years.

13. In the 2006-2007 performance review conducted by Plaintiff's former supervisor and former Head of Lower School, Lucy A. Taggie, the Defendant CCA's Head of Lower School, the Plaintiff was rated 1 and 2 (on a 5 point scale, one being "outstanding"). No negative comments concerning Plaintiff's work performance was indicated.

14. In the 2007-2008 performance review conducted by Plaintiff's supervisor Lucy A. Taggie, the Defendant CCA's Head of Lower School, the Plaintiff was rated 1 and 2 (on a 5 point scale, one being "outstanding"). No negative comments concerning Plaintiff's work performance was indicated. Ms. Tagge handwrote a personal note: to the Plaintiff: **"Thanks for a wonderful year, Deb. It was amazing to observe your interactions with 17 active kindergartners! You are so positive and have taught them so much."**

15. Plaintiff was never again formally reviewed.

16. In the letter dated April 30, 2012, the Defendant Petru handwrote a personal note to the Plaintiff implicitly approving her work performance: **"Deb: It has been wonderful getting to know you this school year. Grace (his daughter) has truly enjoyed her year with you. Thank you. I'm sure there's a lot of pressure of having the Head of School's kid in your class but you've handled it well. Phil".**

17. In the letter dated April 29, 2013, the Defendant Petru handwrote a personal note to the Plaintiff implicitly approving her work performance: **"Deb: Thank you for all that you**

**do for our kids! Maddie (his younger daughter who was about to enter Plaintiff's class in the fall) can't wait! Phil".**

18. In June, 2014, in a letter, Joseph A. Remillard, Plaintiff's then immediate supervisor for 7 years and the Defendant CCA's Lower and Middle School Head, wrote a letter concerning the Plaintiff's work performance, indicating that the Plaintiff was **"**…**an exceptional kindergarten teacher…."** In conclusion Mr. Remillard wrote: **"Deb knows the business of educating children and is a wealth of experience and knowledge. She knows how to be a valuable faculty member."**

**<u>THE DEFENDANTS CONSPIRE TO REPLACE THE PLAINTIFF AND OTHERS</u>**

19. Unknown by the Plaintiffs and other teachers employed by the Defendant CCA during the 2013-2014 school year, all of the Defendants conspired to remove the Plaintiff and other older teachers over the age of 40 from their teaching positions by replacing them with younger teachers.

20. The Defendants had reached the conclusion that a wholesale faculty turnover was required. The Defendant Petru told others in the CCA community, faculty and parents and Lower School teacher Sherri Stockdale that he wanted "new blood" on the faculty, that he wanted his own people on the faculty (a reference meaning that he didn't want older teachers on the faculty that had been hired prior to him taking over as Head of School. The Defendant CCA's Dean of the Upper School Scott Andrews also told Sherri Stockdale statements identical to the above.

21. The Defendant Petru, with the approval of the Defendant CCA's Board of Trustees, began communicating with the parents of the students at CCA indicating that they intended on removing the Plaintiff and other older faculty members because of those work performance

problems. For example, the Defendant Petru, with the approval of the Defendant Board of Trustee told parents and others that the Plaintiff was resistant to change.

22. The Defendant Petru, with the approval of the Board, told parents and others, that CCA had invested substantial resources to have Plaintiff attend the Columbia University Writing Project, and that Plaintiff was resistant to implement the techniques she had learned. Specifically, the Defendant Petru, with the approval of the Board of Trustees, told parents and others that Plaintiff persisted in maintaining that she wanted to keep doing what she had done in the past. The Defendant Petru, with the approval of the Board of Trustees, told parents and others that Plaintiff was resistant to change and was unwilling to be flexible. The Defendant Petru, with the approval of the Board of Trustees, told parents and others that Plaintiff's failed to properly manage behavioral issues in her classroom.

23. All of the publications and statements stated above, were false and defamatory, and were made with the purpose of providing a foundation for not renewing the Plaintiff's teaching contract for the 2014– 015 school year.

24. In keeping with the conspiracy to remove the Plaintiff and other older teachers, the Defendants (all of them) deliberately planned to hire replacements who were significantly younger than the Plaintiff. A letter was sent by the Defendant Petru on June 10, 2014, to parents describing the previous implementation of that plan. The email stated: **"Our administrative team went to work early in the hiring season by attending three well-known independent school career fairs sponsored by Carney Sandoe & Associates, the country's largest independent school recruitment firm, in Boston, New York, and Orlando. Additionally, our team attended career service fairs at Teacher's College of Columbia University,**

**Harvard's Graduate School of Education, and the Massachusetts Educational Recruiting Consortium."**

25. Carney, Sandoe & Associates, upon information and belief, primarily handles recruitment for recently graduated teachers (well under the age of 40). Further the career service fairs referred to in paragraph 25, above, primarily involve matching educational institutions with recently graduated teachers (well under the age of 40).

26. The recruitment aspect of the conspiracy to replace the older teachers, including the Plaintiff began in December, 2013.

27. The Defendant Kelly Petru, on June 4, 2014, with the approval of the Defendant Board of Trustees, told parents, and specifically parent Courtney Bridge, that the Plaintiff and the other older teachers were being replaced because they all failed to follow her professional development guidelines and that they did not "…get on board", which, as to Plaintiff, is false and defamatory and designed to provide a false foundation for Plaintiff's termination.

28. The conspiracy to replace the older teachers with younger teachers was not disclosed to the older teachers, including the Plaintiff, until March, 2014, approximately 3 months before the end of the 2013-2014.

**<u>THE CONSPIRACY IS IMPLEMENTED</u>**

29. In March, 2014, the Defendant CCA, through the Defendant Phillip A. Petru, and with the approval of the Defendant Board of Trustees, began the process of communicating with the older teachers through individual conferences that their teaching contracts would not be renewed for the 2014 – 2015. In fact, 7 teachers in the Defendant CCA's Lower School (7 out of 14) were refused contracts for the 2014-2015 school year, including the Plaintiff. Six of those

teachers (Judy Gordon, Linnea Ochs, Janice Hank, Gray LeMay, Sherry Stockdale and the Plaintiff) were in the protected age group and all were replaced by younger teachers.

30. The Plaintiff was aware, through communicating with others, that the conferences were for the express purpose of informing the teachers that their contract would not be renewed.

31. On March 13, 2014, Plaintiff met with the aforementioned Joseph A. Remillard, who informed the Plaintiff that her contract would not be renewed and that her teaching responsibilities would end at the end of the 2013–2014 school year. Mr. Remillard indicated that he had not been consulted nor was he allowed any input in the decision not to renew the Plaintiff's contract, implying that the decision would not have been his decision and that the decision had been made by the Defendant CCA through the Defendant Phillip Petru with the approval of the Board of Trustees.

32. On March 26, 2014, the Defendant Petru sent the following emails to several of the older teachers, including the Plaintiff, which stated:

> "I wanted to let you know that I intend to write a letter to LS (Lower School) parents in the next couple of days concerning the personnel changes in the Lower School. Before I did though, I wanted to offer you the opportunity to resign/retire which often helps minimize the questions we both might receive from parents once this letter goes out. This type of wording/reasoning is often a better explanation for both the teacher and the school rather than just telling parents that a new teacher will be in Kindergarten (first grade, third grade, fourth grade). Please know that if you decide to resign/retire, the school will not contest unemployment as long as you are actively seeking new employment. I would be happy to provide you with a signed letter indicting this intention."

33. The purpose of the email of March 26, 2014, above, was to deceive the Lower School parents who might have disagreed with having the older teachers, including the Plaintiff, summarily dismissed from their employment and disrupting the faculty-student chemistry that had been established over many years. Additionally, the Defendants did not want to provide any

reason for any parent to remove their children from the school and thus diminish the cash flow provided by significant private school tuition.

34. Each of the teachers to whom the above email of March 26, 2014, was sent, including the Plaintiff declined to resign or retire. (The Plaintiff responded to the request to resign or to retire by the Defendant Petru by sending an email on March 31, 2014, to Mary Jane Keogh (Director of Finance and Operations) which stated**: "I will not tell parents I am retiring or resigning. This option would be asking me to be dishonest to CCA parents. Parents should be told the truth about why half of the Lower School is being replaced."**

35. In fact, the letter to Lower School parents described in the above email of March 26, 2014, was never sent by the Defendant Petru because it was plain, in view of the teacher's refusal to resign or retire, that he would have to, ultimately, explain to the Lower School parents that the Defendants had chosen to involuntarily terminate the employment of those teachers, which would not sit well with the parents. In essence, the teachers had called the Defendant Petru's bluff by refusing to resign or retire.

36. Instead, the Defendant CCA, through the Defendant Petru and with the approval of the Defendant Board of Trustees, communicated vague and slanderous remarks to the Lower School parents as to the reasons for the older teachers' termination, including the Plaintiff, which raised more questions from the parents, which were communicated directly to the Plaintiff. Specifically, Defendant David McGraw falsely stated to parent Greg Botsivalas that Plaintiff and the other older teachers did not comply with curriculum changes and that was a reason that they were not being offered new contracts.

37. On multiple occasions, when asked by her students' parents as to why she was leaving the employment of the Defendant CCA, the Plaintiff told the truth: that she had, for no

reason, not been offered a contract renewal for the school year 2014–2015 and that she was not resigning or retiring.

38. The Plaintiff was on leave from April 14 – April 18, 2014, to help her daughter care for a newborn child. A representative of the Defendant CCA telephoned her on April 15, 2014 and attempted to coerce and harass the Plaintiff to retire or resign, effective immediately. An Agreement of Separation and Release was sent to Plaintiff for signature. That Agreement was predicated on the fact that **"…the School intends to terminate Ms. Sullivan's employment on April 22, 2014".** Further, the Agreement stated among other things that:

A. Plaintiff would be given her pay and benefits for the balance of the school year.

B. Plaintiff would release any entity or employee associated with the Defendant CCA from any and all liability for any cause of action that she may have had against them.

C. That she would not disclose the agreement to others, and would not disparage any entity of employee associated with the Defendant CCA.

39, The Defendants were, by virtue of the Agreement, attempting to coerce the Plaintiff into leaving her job by threatening her with discharge (Plaintiff was to be terminated) in exchange for receiving benefits (pay and benefits) to which she was already entitled.

40. The intent of the Defendants was to silence the Plaintiff from speaking the truth to parents and to other teachers about the reasons that she was to be terminated.

41. Because of Plaintiff's standing among her fellow teachers and because of her warm relationship with her students and their parents, the Plaintiff was perceived by the Defendants as a threat and they acted, by virtue of the Agreement and its potential obligations to silence that threat.

42. While the Plaintiff was on leave from April 14 – 18, 2014, upon information and belief, the Defendant Kelly Petru, and others, told other Lower School teachers that the Plaintiff had decided to retire and remain at home following the expiration of her leave on April 18, 2014. Specifically, the Defendant Kelly Petru stated the above to Learning Specialist and her assistant Barbara Goydas, who repeated this to Pre-K teacher Lauren Buckley). Additionally, the Defendant Kelly Petru and others in the Defendant's CCA administration began to contact another former teacher about replacing the Plaintiff and began to reorganize the Plaintiff's classroom in anticipation of Plaintiff's termination.

43. In April and May, 2014, the Defendants decided to have teacher applicants (replacements for the older teachers) tour the facilities and demonstrate their teaching skills by teaching an actual lesson to the classes of the older teachers that were being terminated. This added to the hostile work environment for the Plaintiff and the older teachers, who felt humiliated and emotionally disturbed by seeing their potential replacements teaching their classes. The Plaintiff was allowed by Mr. Remilliard to take that day off so as not to add to Plaintiff's existing humiliation and emotional distress at having been replaced for no legitimate reason.

44. The Plaintiff refused to resign or retire and returned to her teaching responsibilities on April 28, 2014, following the April 21-25 spring break, in large part, because of her dedication to her students (specifically, there was only 27 school days left in the school year and the disruption to students would have been very distressful to students and parents.) Plaintiff indicated in an email sent to the Defendant CCA's head of HR, Nancy Schauwecker, on April 17, 2014: **"I have decided to stay on and teach until the end of the school year in**

**June. My first priority is (and always has been) my students. I will return to work on Monday, April 28th."**

45. The Plaintiff continued to teach for the remainder of the school year.

46. The Plaintiff was replaced for the 2014- 2015 school year by a 24 year old teacher with no full-time experience as a head classroom teacher.

47. After the close of the 2014-2015 school year, the Plaintiff and other Lower School teachers whose contracts were not renewed, felt aggrieved by the actions of the Defendants and communicated the following email to the Defendant members of the Board of Trustees:

> **Dear Board of Trustees Member:**
>
> **We write to you as professionals and dedicated Cape Cod Academy educators who find ourselves in the position of having to defend our professional integrity. We write to ask that you and the administration of Cape Cod Academy cease and desist the continuance of the lies, rumors, misrepresentations, and miscommunications about our separation from Cape Cod Academy.**
>
> **When we were told that our contracts would not be renewed, we were given a variety of reasons: the parents wanted "new blood" in the Lower School; Mr. Petru wanted his "own people;" Mr. Petru wanted Mrs. Goydas to teach fourth grade; the position of Lower School librarian/technology teacher was being eliminated. None of the reasons given were based on our performance. However, we know from several parents and Upper and Middle School teachers that Mr. Petru and one member of the Board of Trustees led them to believe that the terminations were performance based. The rumor being spread is that all of the teachers whose contracts were not renewed were given a list of changes to make. Those that were willing or able to make the changes were kept, while those that did not were terminated. This is completely untrue. Each of us requested and received copies of our employee files. The most recent formal, written evaluation for any of us was in 2009. The evaluations in our files represent each of us as committed, highly capable educators. None of us has ever been "written up" for dereliction of our duties. This rumor becomes more egregious when coupled with the email received by Mrs. Huber, Mrs. Ochs, Mrs. Stockdale, and Mrs. Sullivan from Mr. Petru on the evening of March 26, 2014. It stated:**
>
> **"I wanted to let you know that I intend to write a letter to LS parents in the next couple of days concerning the personnel changes in the Lower School.**

**Before I did though, I wanted to offer you the opportunity to resign/retire which often helps minimize the questions we both might receive from parents once this letter goes out. This type of wording/reasoning is often a better explanation for both the teacher and the school rather than just telling parents that a new teacher will be in Kindergarten [first grade, third grade, fourth grade]. Please know that if you decide to resign/retire, the school will not contest unemployment as long as you are actively seeking new employment. I would be happy to provide you with a signed letter indicating this intention."**

**We all declined. It would have been dishonest to say that we had resigned or retired, and unethical to request unemployment benefits if we had done so. In fact, Mr. Petru did not write a letter to parents. Instead, he called each family to tell them about the changes. Many parents reported that they did not receive an adequate explanation. We have no way of knowing exactly what he said, what lies or misrepresentations he may have made. In addition, Mr. Petru did not notify them that there would no longer be a Lower School librarian/technology teacher.**

**On Wednesday, June 4th, it was brought to our attention that while attending the end of the year party for the 2013-2014 second grade, Mrs. Petru informed the parents that a new third grade teacher had been hired and gave details, including that she is 24 years old and has just finished student teaching. When the parents asked about the teachers who had been let go, Mrs. Petru said that she had conducted professional development and they should have gotten on board. It is defamatory for Mrs. Petru or any CCA administrator to make statements implying that we did not follow the curriculum for which we attended professional development workshops, and we want it to stop. It should be noted those of us who are classroom teachers attended and completed all the professional development requirements, including attending classes on our own time, in NYC during the summer. While Mrs. Petru and Mrs. Goydas attended many more workshops than we did, they certainly did not conduct turnkey training. They made arrangements to come into our classrooms to "coach" us on several occasions, but rarely followed through. They usually came late or not at all.**

**Mr. Petru has had virtually no presence in the Lower School during his tenure. He made one visit to each Lower School classroom in the winter of 2013-2014. After doing so, he provided no feedback to teachers about their instruction or methods. Mr. Petru did not respond to email messages asking for his comments. These visitations now appear to have been largely perfunctory and made to give his planned actions some merit, especially in light of this statement in his June 10, 2014 letter to parents regarding hiring updates. "Our administrative team went to work early in the hiring season by attending three well-known independent school career fairs sponsored by Carney Sandoe & Associates, the country's largest independent school recruitment firm, in Boston, New York, and Orlando. Additionally, our team attended career service fairs at Teacher's College of Columbia University,**

**Harvard's Graduate School of Education, and the Massachusetts Educational Recruiting Consortium."**

**Despite the difficult situation we were placed in, during the last three months of the school year we stood by our students, coming to work each day in an increasingly hostile environment and doing our best to protect our students from it. They have always been our reason for being there and we continued to make their education and well-being our top priority. While we and our students did not always receive the support we deserved from our coaches and administrators, we always gave the students our best. The rest of the faculty at Cape Cod Academy continues to do the same, in spite of the atmosphere of powerlessness, intimidation, and fear that has been created by Mr. and Mrs. Petru's blatant nepotism and favoritism. Many of our colleagues expressed fear of losing their jobs if they supported us or were seen talking to us. Mrs Gordon was even called into Mr. Petru's office and told not to discuss the situation with other teachers or parents. Holding teacher's jobs over their heads to gain compliance and eliminate criticism creates a serious misuse of power. Teachers feel they have no voice and can be dismissed at the whim of Mr. and Mrs. Petru without warning. This abuse of power is not the democratic model CCA used to hold up so proudly as an example to our students. While the faculty is highly professional and dedicated to their students' and the school's well-being, you cannot expect that such an environment will not adversely impact teaching and learning.**

**We ask again that you see to it that the lies, rumors, misrepresentations, and miscommunications being perpetuated about our separation from Cape Cod Academy stop immediately. Should you need any further information, please contact us.**

48. The actions of the individual Defendants are imputable to the Defendant Board of Trustees as each and every member of the Board had full knowledge of the wrongful actions described above.

49. After her termination, the Plaintiff discovered that there was an inequality in the rate of pay for teachers based upon their sex/gender.

50. Specifically, male teachers in the Defendant CCA's Upper School, were paid significantly more in terms of compensation that those female teachers in the Lower School, where Plaintiff taught.

51. The Defendant CCA paid male teachers in the Upper School more than female teachers in the Lower School for equal work requiring equal skill, effort and responsibility and which are performed under similar working conditions.

**COUNT I**

**AGE DISCRIMINATION - ADEA**

52. The Plaintiff hereby incorporates by reference paragraphs 1-51 above as if fully set forth herein.

53. The Plaintiff, as alleged above, has been discriminated against, in violation of the Age Discrimination in Employment Act (ADEA) in that the above adverse employment action (failure to renew her employment contract) constituted unlawful discrimination on the basis of age.

54. The Plaintiff was 65 years of age at all times pertinent to the allegations contained above and thus was/is a member of the protected category.

55. The Plaintiff was subjected to an adverse employment action (failure to renew her employment contract).

56. The Plaintiff was qualified for the position of a kindergarten teacher.

57. The Plaintiff was replaced by a younger person.

58. As a direct and proximate result of Defendant's unlawful discrimination as set forth above, Plaintiff has suffered lost wages, benefits, and loss of employment opportunities, as well as substantial damages for pecuniary losses, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

## COUNT II

## HOSTILE WORK ENVIRONMENT HARASSMENT

59. The Plaintiff hereby incorporates by reference paragraphs 1-58, above as if fully set forth herein.

60. The Plaintiff belonged to a protected group. See above.

61. The actions of the Defendants as described above (failure to renew her employment contract, asking her to resign or retire on more than one occasion, communicating to other employees that the Plaintiff had retired or resigned, seeking to replace the Plaintiff before the end of the school year, spreading false rumors about her professional reputation, reorganizing her classroom, etc.) was because of her age.

62. The unwelcome conduct of the Defendants as described above was intended to or in fact did substantially interfere with the Plaintiff's employment and/ created an intimidating, hostile and offensive work environment.

63. The actions of the individual Defendants are imputed to the Defendant CCA by respondeat superior.

## COUNT III

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

64. The Plaintiff incorporates paragraphs 1-63, as if fully set forth herein.

65. The actions stated above constituted extreme and outrageous conduct on the part of the Defendants and were beyond all possible bounds of decency.

66. The actions of the Defendants were intentional and/or reckless, and were designed on inflicting emotional distress on the Plaintiff. Further the Defendants knew, or should have known that severe emotional distress was likely to result.

67. In fact, the above wrongful actions by the Defendants caused the Plaintiff to suffer emotional distress.

68. The emotional distress suffered by the Plaintiff was severe.

**COUNT IV**

**SLANDER**

69. The Plaintiff hereby incorporates by reference paragraphs 1-68 above as if fully set forth herein.

70. The statements made above by the Defendants relating to the professional reputation of the Plaintiff (see paragraphs 21, 22, 23, 28, 37, and 38, above) were false and defamatory, and were published to the parents of the Plaintiff's students.

71. The statements constituted slander per se, and had the effect of injuring the Plaintiff's reputation within the educational community.

72. As a direct and proximate result of the publication of these statements the Plaintiff has suffered injury, both physical and emotional.

**COUNT V**

**VIOLATION OF THE EQUAL PAY ACT**

73. The Plaintiff incorporates paragraphs 1-72, as if fully set forth herein.

74. As the Defendant CCA failed to pay the Plaintiff for equal work for teaching as male teachers in the Upper School, which work requires equal skills, effort and responsibility and were performed under similar working conditions, the Defendant CCA violated the Equal Pay Act (29 USC 206, et seq).

**COUNT VI**

**LOSS OF CONSORTIUM**

75. The Plaintiff incorporates paragraphs 1-74, as if fully set forth herein.

76. The Plaintiff GARY F. SULLIVAN suffered a loss of consortium as a result of the wrongful actions of the Defendant as set forth above.

WHEREFORE, Plaintiff requests relief from this Honorable Court against Defendant as follows:

1. An order of this court awarding Plaintiffs compensatory damages in an amount to be determined at trial in this matter, and in excess of $75,000.00.

2. An order of this court awarding Plaintiff punitive damages in an amount to be determined at the trial of this matter;

3. An award to Plaintiff of attorney fees, costs of litigation, and interest; and

4. An order of this court granting Plaintiff further relief that it deems just and equitable.

/s/Donald L. Bramlage, Jr.___________
Donald L. Bramlage, Jr.
Attorney for Plaintiffs

Dated: 7-8-2015

**JURY DEMAND**

The Plaintiffs hereby demand a trial by jury of all issues so triable.

/s/Donald L. Bramlage, Jr.___________
Donald L. Bramlage, Jr.

Dated: 7-8-2015